**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
NORTHWESTERN DIVISION**

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | **SENTENCING MEMORANDUM** |
| | ) | |
| vs. | ) | |
| | ) | |
| Lloyd Joseph Counts, III, | ) | Case No. 4:09-cr-052 |
| | ) | |
| Defendant. | ) | |

_____

I.    **BACKGROUND OF THE CASE**

The defendants Lloyd Counts, Jr., and Lloyd Counts III, distributed marijuana on the Turtle Mountain Indian Reservation since approximately 2002.  During that time, Lloyd Counts Jr.'s initial source of supply was Charlie Anderson of Becker County, Minnesota.  See PSR ¶¶ 8-12.  Anderson and Counts Jr. would acquire and transport 5-10 pounds of marijuana from the Minneapolis area.  The two men paid approximately $900 per pound for the marijuana.  Often Counts Jr. did not accompany Anderson but would meet him at his residence, acquire the load, and take the drugs back to the reservation for distribution.  This arrangement occurred over the course of 1 ½ years and resulted in the purchase and distribution of approximately 150 pounds of marijuana.

Anderson introduced Counts Jr. to two Mexicans in the Fargo area.  From 2004 to 2008, Lloyd Counts Jr. obtained approximately 10 pounds of marijuana per month from these individuals, Gilberto Fernandez-Toscano, a/k/a "Alex," and Javier Guzman-Gonzales, a/k/a "Gordo."  Counts Jr. would travel from the Belcourt area to Fargo to obtain marijuana from Alex and Gordo, then return to the reservation to sell the marijuana.  Alex and Gordo

provided Counts Jr. with a Tracfone cell phone.   This phone was used solely for communication regarding drug transactions.   The total amount of marijuana acquired by Lloyd Counts Jr. from 2004-2008 was approximately 600 pounds (272 kg).

Sometime in 2008, and largely due to his deteriorating health, Lloyd Counts Jr. turned the drug trafficking business over to his son, Lloyd Counts, III.   At that time, Lloyd Counts, III was given the Tracfone (which Alex and Gordo replaced every ninety days), along with the names and numbers of the people to whom Lloyd Counts Jr. had been dealing.   Lloyd Counts, III initially reported to law enforcement authorities that he and his father were "partners" in the drug trafficking business for eight years.   According to statements made at his change of plea hearing, Lloyd Counts, III started running drugs for his father in March 2003.   He would typically acquire and sell 50-100 pounds of marijuana every six weeks.   He paid $1,300 per pound and sold it for $2,000 per pound ($1,800 per pound to family members) with an average profit margin of approximately $600 per pound.

The evidence reveals that Lloyd Counts, III transported marijuana from Fargo to the Turtle Mountain Indian Reservation for distribution and stashed it in several different old cars at the Clarence St. Claire residence since 2006.   Lloyd Counts, III estimated that he acquired and sold an average of 500 pounds of marijuana per year for eight years. Specifically, he supplied marijuana to the following: Lloyd Counts Jr. - 10 pounds per month for six years (720 lbs); Clifford Counts - 10 pounds per month for two to three years (240-360 lbs); Larry Fourchaine - six pounds per month for four years (288 lbs); Peiri Delorme - three to four pounds per month for two years (72 to 96 lbs); Troy Boser - three to four pounds

per month for two years (72-96 lbs); Jason Counts - three to four pounds per month for two to three years (72-144 lbs); Lonnie Nadeau - two to three pounds per month for four to five years (48-180 lbs); Lonnie Azure - three to four pounds per month for one year (36-48 lbs); Richard Morin - two pounds per month for one to two years (24-36 lbs); Kevin Wallette - one to two pounds per month for one to two years (12-48 lbs); Clifford Nadeau - one pound per month for one year (12 lbs); Jimmy Counts - four to six ounces per month for one year (4.5 lbs); and Rocky Demery - 30-40 pounds total.

Lloyd Counts, III also admitted to distributing approximately six pounds of methamphetamine on the reservation during the time frame of the conspiracy.  At the change of plea hearing on May 11, 2010, Lloyd Counts, III estimated that during the last year he ran the drug trafficking operation, he sold approximately 500-600 lbs of marijuana.

## II.   LEGAL DISCUSSION

### A.   DRUG QUANTITIES

In the Presentence Investigation Report (PSR), the probation officer determined the defendant's drug trafficking activities involved at least 500 pounds of marijuana per year for at least five years (2,500 lbs) which equals a drug amount of 1,134 kg.  See PSR ¶ 20.  The defendant admitted by his plea that the conspiracy involved 1,000 kg or more of marijuana.  The PSR reveals the defendant admitted to distributing six pounds of methamphetamine on the Turtle Mountain Indian Reservation during the time of the conspiracy.   The drug equivalent table for methamphetamine is 1 gm of meth = 2 kg of marijuana.  See U.S.S.G. § 2D1.1, Application Note

10(E).  The 6 lbs of methamphetamine converts to 5,448 kg of marijuana.   In accordance with U.S.S.G. § 2D1.1(c)(3), the base offense level is 34 (1,134 kg + 5,448 kg = 6,582 kg of marijuana). The Sentencing Guidelines indicate that the base offense level is 34 if the controlled substances and quantities range from at least 3,000 kg but less than 10,000 kg of marijuana.  Id.

The Court finds by a preponderance of the evidence that the drug quantity calculations as set forth in the PSR are reasonable, accurate, and conservatively reflect the quantities involved in this drug trafficking conspiracy. The defendant admitted to such drug quantities when he was first interviewed by federal law enforcement officers, namely, FBI Agent Ryan O'Neil, on February 27, 2009.

**B.      ADJUSTMENT FOR ROLE IN THE OFFENSE**

It is well-established that the Government has the burden of proving by a preponderance of the evidence that the aggravating role enhancement is warranted.   United States v. Garcia-Hernandez, 530 F.3d 657, 665 (8th Cir. 2008); United States v. Mesner, 377 F.3d 849, 851-52 (8th Cir. 2004).  U.S.S.G. § 3B1.1 provides as follows:

Based on the defendant's role in the offense, increase the offense level as follows:

(a)      If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by **4** levels.

(b)      If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by **3** levels.

(c)      If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by **2** levels.

4

U.S.S.G. § 3B1.1 (emphasis in original).  The commentary and application notes to Section 3B1.1 further provide that:

1.    A "participant" is a person who is criminally responsible for the commission of the offense, but need not have been convicted.  A person who is not criminally responsible for the commission of the offense (e.g., an undercover law enforcement officer) is not a participant.

2.    To qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants.  An upward departure may be warranted, however, in the case of a defendant who did not organize, lead, manage, or supervise another participant, but who nevertheless exercised management responsibility over the property, assets, or activities of a criminal organization.

3.    In assessing whether an organization is "otherwise extensive," all persons involved during the course of the entire offense are to be considered.  Thus, a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive.

The PSR recommended that Lloyd Counts, III be considered a manager and supervisor and the criminal activity involved five or more participants, or "was otherwise extensive."  See PSR ¶ 23.  As a result, the offense level was increased by three levels in the PSR.  The Government challenges the imposition of a three-level enhancement.  Counts challenges any adjustment for a role enhancement.  The Government requests the Court find that a four-level increase pursuant to U.S.S.G. § 3B1.1(a) is warranted for Counts's role as an organizer or leader of the criminal activity that involved more than five participants or "was otherwise extensive."

The Court has carefully reviewed the Sentencing Guidelines and particularly U.S.S.G. § 3B1.1, and the commentary and application notes to that guideline provision.  The Court has also carefully considered all of the factors recommended in Section 3B1.1 which include the exercise of decision-making authority, the nature of the participation in the commission of the offense, recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree

of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and the authority exercised over others.

The Court finds by a preponderance of the evidence that the more appropriate and reasonable role adjustment enhancement is a two-level increase for Counts' role as an organizer, leader, manager, or supervisor in any criminal activity other than as described in U.S.S.G. § 3B1.1(a) or (b). See U.S.S.G. § 3B1.1(c).  To be subject to a role enhancement under U.S.S.G. § 3B1.1(c), a defendant need only manage or supervise one other participant.  See United States v. Mata-Peres, 478 F.3d 875, 877 (8th Cir. 2007).  The Eighth Circuit has said that the term "manager" or "supervisor" is to be broadly construed under Section 3B1.1.  United States v. Erhart, 415 F.3d 965, 973 (8th Cir. 2005).  It is clear and undisputed that Lloyd Counts, III managed or supervised at least one other "participant" in the drug conspiracy.  He was directly involved in drug trafficking from 2003-2008 and essentially ran the entire drug operation as CEO since 2008.  No one can make a reasonable argument to the contrary.

The Court finds that the Government has failed to sustain its burden of proof as to the triggering of a four-level increase under U.S.S.G. § 3B1.1(a).  The evidence that was presented by the Government at the evidentiary hearing was factually insufficient to support a four-level increase under U.S.S.G. § 3B1.1(a) or a three-level increase under U.S.S.G. § 3B1.1(b).  The Court will give the defendant the benefit of the doubt – however, there is no dispute that Lloyd Counts, III is deservant of an aggravating role enhancement.  He essentially ran the entire drug trafficking conspiracy on the Turtle Mountain Indian Reservation during its last year of operation.  The following testimony of Lloyd Counts, III at the evidentiary hearing clearly supports this finding:

Q.      (by the Court)  And then you told me that in 2007 you took over the business.

A.      Yes.

Q.      Or you had control of the business I think is what you said?

A.      Yep.

Q.      Correct?

A.      Correct.  I had the phone and contacted the people.

Q.      And were you the only person that would have direct contact with these Mexican gentlemen that were the suppliers of marijuana?

A.      Yes.

Q.      And in terms of who was going out to pick up the marijuana after you took over control of the business in 2007, who would that have been?

A.      I still did it.

. . .

Q.      So after you took over and your father paid off his debt to these Mexican suppliers, then did you – were you the one that kept track of the books or the owe sheet?

A.      Yes, I did.

Q.      And what exactly did you keep, just a real rough draft of an owe sheet where you kept track of who you supplied drugs to and what they owed you?

A.      Yep.

. . .

Q.      And you had the TracFone and you were the sole contact with the Mexican suppliers, right?

A.      Yes.

Q.      And then you were – you were the one that was solely responsible to pay for those drugs that had been fronted to you by these Mexican suppliers, right?

A.      Yep.

7

Q.      And in terms of the determining who would dictate the price that the marijuana you sold in the Belcourt area at least what you would charge, was that you who made that determination it was going to be $1,800 to $2,000 a pound?

A.      When I was originally getting it from my dad when he was running it, that's what I was charging so when I received it, I just kept the amounts the same. I never went up went down. I mean it was pretty much the same.

Q.      And would it be fair to say – correct me if I'm wrong, if it's not accurate, but most if not all of the people that you provided marijuana to in the Belcourt area were purchasing dope from you in quantities of more than a pound?

A.      In the end, yeah, when I had – when I took control it was they were getting more than – most of them would get more than a pound, pound and a half maybe two.

Q.      And is it fair to say that you knew those people were using or were selling that weed?   They weren't just using it all for their own personal consumption?

A.      Yeah, I assume they had to have sold it somehow some way to repay the money they owed.

. . .

Q.      So let's just focus on the calendar year 2008 and up until 2009 when you were charged.  Give me your best estimate in 2008 how many individuals in the Belcourt area that you would personally provide with marijuana to obtain from these Mexican suppliers in Fargo?

A.      When I took over?

Q.      Yea.

A.      2008.  Probably ten, nine maybe, eight to ten people somewhere in there.

Q.      And in terms of the business increasing substantially, I think you put it after you took it over, did you see a 25 percent increase in profits, 50 percent increase in profits after you took over or – I'm just curious?

A.      Probably well, I went from paying 16 and charging two for it, making 400, to getting it for 13 and selling it for an average – I averaged about 19, so probably $600 on a pound average.

8

Q.      In terms of quantities, did the quantities increase in 2008 after you took over the business from what your father had been?

A.      Yeah, it started – they started getting – I think it was more that they were trusting or I don't know if they were – if it was that or if they were getting bigger and bringing in bigger loads and just throwing us – throwing myself you know a bigger load or what.

Q.      But you were finding that there were more people younger people that were contacting you and requesting marijuana from you than what you had experienced or known about earlier years?

A.      Yeah.  When I never had no control I mean it was people were never really not coming to me as much as when I took over.  I mean, it was just like doors were open everybody knew I mean it was people were coming to see me and it was – only way to state it, I guess the doors were open.  Everybody kind of knew.

                                          . . .

Q.      And the marijuana that you would pick up in Fargo would that be in packaged in just one large bag and then you in turn would have to weigh it out when you got back to Belcourt or was it packaged weighed out and delivered to you in one pound quantities?

A.      Nope, it was blocks.  It was anywhere from ten pound blocks to 25 pound –

Q.      Okay.

A.      – blocks wrapped Saran Wrap, something to cover the smell, dryer sheets, coffee grounds, lithium grease wrapped with wallpaper so you can't see inside, tell what color it is and it was.

Q.      You would break it down somewhat when you got back to Belcourt?

A.      Yeah correct.

Q.      Do that in your garage?

A.      Yes.

Q.      Weigh it out and repackage it?

A.      Yep.

9

Q.      Okay.  Did anybody help you with that?

A.      No just myself.

Tr. pp. 123-126, 128-131.

In summary, the Court finds that the Government has failed to sustain its burden in proving that either a four-level or a three-level increase for a role enhancement is warranted.  The Court readily acknowledges that the evidence is close, but it is factually insufficient to support a preponderance of the evidence standard.  Further, a four-level or three-level increase is not critical to the ultimate sentence to be imposed.  See U.S. v. Escobar-Quintanilla, — F.3d —, 2010 WL 2890270, C.A.8 (Iowa), 2010, July 26, 2010.  Nevertheless, the Court is convinced, and the facts clearly establish by a preponderance of the evidence, that a two-level increase for an aggravating role adjustment is appropriate, warranted, and reasonable as per the circumstances under U.S.S.G. § 3B1.1(c).  The Court finds that the defendant managed or supervised at least one other "participant" in criminal activity and to argue to the contrary is disingenuous at best.

C.      **SAFETY VALVE RELIEF**

The Court has found that Lloyd Counts, III was a manager or supervisor of at least one other participant in the drug conspiracy.  When a defendant receives an adjustment for an aggravating role under U.S.S.G. § 3B1.1, he is ineligible for safety valve relief under U.S.S.G. § 5C1.2(a).  The Court finds by a preponderance of the evidence that Lloyd Counts, III was a manager or supervisor of at least one other participant in the drug conspiracy.  As a result, the defendant is not eligible for safety valve relief.

**III.**      **CONCLUSION**

Based upon the factual findings made by the Court as set forth in this Sentencing Memorandum, which facts are supported by a preponderance of the evidence, the Court finds the following advisory Sentencing Guideline range applies:

| | | |
|---|---|---|
| **Base Offense Level:** | **34** | **(U.S.S.G § 2D1.1(c)(3))** |
| **Adjustment for Role in the Offense:** | **+2** | **(U.S.S.G. § 3B1.1(c))** |
| **Acceptance of Responsibility:** | **-3** | **(U.S.S.G. § 3E1.1)** |
| **Total Adjusted Offense Level:** | **33** | |
| **Criminal History Category:** | **I** | **(U.S.S.G. § 4A1.1)** |
| **Advisory Guideline Range:** | **135-168 months imprisonment** | |

**IT IS SO ORDERED.**

Dated this 23rd day of August, 2010.


_/s/ Daniel L. Hovland_____
Daniel L. Hovland, District Judge
United States District Court

11